## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TAO LUO,** *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 07-0395(RJL) |
| | ) | |
| **ALBERTO GONZALES,** *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### FEDERAL DEFENDANTS' MOTION TO DISMISS

Federal Defendants, by and through their attorney, the United States Attorney for the District of Columbia, respectfully move this Court to dismiss this case, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction, and for failure to state a claim upon which relief can be granted. This motion is based on the accompanying Memorandum of Points and Authorities, supporting Declarations of the Federal Bureau of Investigation ("FBI") and the United States Citizenship and Immigration Services ("USCIS"), and the attached Exhibit: United States Citizenship and Immigration Services ("USCIS or CIS") Fact Sheet, "Immigration Security Checks – How and Why the Process Works." A proposed Order is also attached.

Respectfully submitted,

_____Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_____s/Sherease Louis_____
SHEREASE LOUIS
Special Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TAO LUO, *et al.*,                          )
                                            )
                          Plaintiffs,       )
                  v.                        )        Civil Action No. 07-0395(RJL)
                                            )
ALBERTO GONZALES, *et al.*,                 )
                                            )
                          Defendants.       )
                                            )

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO  DISMISS**

Federal Defendants, U.S. Customs and Immigration Services ("USCIS"), U.S.

Department of Homeland Security ("DHS"), and Federal Bureau of Investigation ("FBI"),

respectfully move to dismiss the Complaint for Mandamus filed by the Plaintiff in the

above-captioned matter, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject

matter jurisdiction, and for failure to state a claim upon which relief can be granted.

**STATEMENT OF FACTS**

Plaintiffs Tao Luo, Peng He and minor Mengming Luo, Chinese citizens, filed a

Complaint seeking relief to compel Defendants to approve a pending application for adjustment

of status to lawful permanent resident for Tao Luo, and to approve pending derivative

applications for Luo's wife, Peng He, and daughter, Mengming Luo. Complaint  ¶¶ 2, 7, 10.

Plaintiffs filed Forms I-485, Application to Adjust Status to Permanent Resident, on August 12,

2004. Compl. ¶ 10, Puripongs Decl. ¶ 13.  Plaintiff Tao Luo's name check has not been

completed and remains pending.  Cannon Decl. ¶ 22.  The name check for Plaintiff Peng He was

completed on March 3, 2005.  Cannon Decl. ¶ 23.  Plaintiffs' national security background

investigations are ongoing and have not been completed.  Puripongs Decl. ¶ 13.  Once the

national security background investigations are completed, Plaintiff Tao Luo's application will

be adjudicated.  *Id.*  Approval of Plaintiff minor child Mengming Luo and Plaintiff Peng He's applications for adjustment of status to lawful permanent residents are dependent on the approval of Plaintiff Tao Lu's application.  Puripongs Decl. ¶ 13.

**ISSUE PRESENTED**

The issue is whether an applicant for adjustment of status, to that of a permanent resident of the United States, whose security check is pending, has presented this Court with a justiciable action such that a Court may order mandamus relief.  Given that the adjustment of status process is committed to the sole discretion of the Attorney General, this Court has no jurisdiction over the issue, and should therefore dismiss the Complaint for lack of subject matter jurisdiction, failure to present a ripe claim, and failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## I.     THE ADJUSTMENT OF STATUS APPLICATION PROCESS

In earlier times, an alien who sought legal permanent resident status in this country did so by applying to the consulate in his native country. *See Elkins v. Moreno*, 435 U.S. 647, 667 (1978). As a convenience to the alien, Congress permitted the alien to avoid a costly trip out of the country to obtain a visa, and created the adjustment of status process permitting the alien to file without leaving the country.  *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976). While the alien physically stands inside the United States, legally, he stands in his native country and the Attorney General acts as the consulate. *See Choe v. INS*, 11 F.3d 925, (9th Cir. 1993). Adjustment of status is a matter of grace. *See Elkins*, 435 U.S. at 667. The alien, at all times, bears the burden of proof, to persuade the Attorney General to grace the applicant in his discretion with the privilege of lawful permanent residence status. *Id.*

The Attorney General has exclusive jurisdiction to adjust the status of certain aliens.

8 U.S.C. § 1255 exclusively authorizes the Attorney General to adjust to lawful permanent residence status certain aliens who have been admitted into the United States.  This adjustment of status is expressly and solely committed to the Attorney General's discretion. Section 1255(a) provides:

> The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time of his application.

8 U.S.C. § 1255(a) (emphasis added).

Not only does the statute vest the Attorney General with exclusive and discretionary authority, it also does not place any time restriction upon the Attorney General.  The federal regulations governing adjustment of status, 8 C.F.R. § 245.1 *et seq.*, also do not place any time restrictions upon the Attorney General.  Generally, the Attorney General may direct any necessary investigation of an applicant.  See 8 C.F.R. § 103.2(b)(7).  Further, the Attorney General may withhold an adjudication pending completion of the investigation.  *See* 8 C.F.R. § 103.2(b)(18).

In 1994, Congress enacted 108 Stat. 1725, 1766, Pub. L. 103-317, § 506(d), which provides that "[t]he Immigration and Naturalization Service shall conduct full fingerprint identification checks through the Federal Bureau of Investigation for all individuals over sixteen years of age adjusting immigration status in the United States pursuant to this section."  Shortly after September 11, 2001, USCIS and the FBI responded to even greater national security concerns, and provided for a more stringent security check review.  Cannon Decl. ¶¶ 16, 17, 18.  These agencies have expanded the scope of the background screenings, from ordinary criminal

background investigations to matters of national security that necessarily involves the cooperation of foreign governments. Puripongs Decl. ¶¶ 3, 4, 10. After an alien submits an adjustment application (Form I-485), USCIS, in conjunction with the FBI, conducts several forms of security checks to ensure that the alien is eligible for the benefit and that he is not a risk to national security or public safety. *Id.* These checks currently include: 1) a FBI fingerprint check for relevant criminal history records on the alien; 2) a check against the Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland Security (DHS) and contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and 3) an FBI name check, that is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. Puripong Decl. ¶ 4. *See* 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States").

## II.     STANDARD OF REVIEW

### A.     The Legal Standard for a Motion to Dismiss under Rule 12(b)(1)

Under the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction cannot be conferred by the parties, nor can a defect in subject matter jurisdiction be waived by the parties. *See United States v. Cotton*, 535 U.S. 625, 630 (2002). Under Rule 12(b)(1), the plaintiff squarely bears the burden to establish subject matter jurisdiction, especially against the

United States.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994); *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 432 (1990); *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  The scope of Rule 12(b)(1) is flexible and can serve as a procedural tool for raising a variety of challenges such as a failure to exhaust administrative remedies and ripeness.  *See United States v. Lahey Clinic Hosp.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005).  The Court may not presume the truthfulness of Plaintiffs' allegations regarding subject matter jurisdiction, but must evaluate for itself the merits of the jurisdictional claims.  *Id.*  In review of a Rule 12(b)(1) motion, this Court may consider matters outside of the pleadings without converting the motion to summary judgment, and no presumptive truthfulness attaches to the allegations of the complaint.  *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

**B.      The Legal Standard for a Motion to Dismiss under Rule 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In making determinations on a motion to dismiss under Rule 12(b)(6), a court must view facts alleged in the complaint in the light most favorable to the Plaintiff.  *Id.; see also Nix v. Hoke*, 139 F.Supp.2d 125, 131 (D.D.C. April 2001) (citing, *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)), and *Slaby v. Fairbridge*, 3 F. Supp. 2d 22, 27 (D.D.C. 1998).  In this case, Plaintiff fails to establish a right to relief on the claims asserted, even when accepting the facts he alleges as true.

## ARGUMENT

**I.     The Adjustment Statutes Vest the Attorney General with Sole Discretionary Authority and Bar Judicial Review.**

The adjustment of status application process is expressly committed to the sole discretion of the Attorney General.  See 8 U.S.C. § 1255(a).  Section 1255(a) provides:

> The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time of his application.

8 U.S.C. § 1255(a) (emphasis added).  Not only does the statute vest the Attorney General with exclusive and discretionary authority, it also does not place any time restriction upon the Attorney General.  The corresponding section of the Code of Federal Regulations that governs adjustment, 8 C.F.R. § 245.1 et seq., also does not place any time restriction upon the Attorney General. The Attorney General may direct any necessary investigation of an applicant. See 8 C.F.R. § 103.2(b)(7).  Further,  the Attorney General may withhold an adjudication pending completion of the investigation. See 8 C.F.R. § 103.2(b)(18).  There is no judicial review of that discretion. See 8 U.S.C. § 1252(a)(2)(B)(ii).  Section 1252(a)(2)(B) provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including....sections 1361 and 1651 of [Title 28], and except as provided in subparagraph (D), and regardless of whether the judgment, decision or action is made in removal proceedings, no court shall have jurisdiction to review -
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(1), 1129b, 1229c, or 1255 of this title, or
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of [Title 8].

8 U.S.C. § 1252(a)(2)(B). Subsection (i) is inapplicable here because there has not been any "judgment regarding the granting of relief" with respect to Plaintiffs' applications. Broadly worded subsection (ii), which applies to "any other decision or action," precludes this Court's review of Plaintiffs' claims. *See Safadi v. Howard*, 466 F. Supp.2d 696, 699-700 (E.D.Va. 2006) (no jurisdiction to provide relief under a writ of mandamus or the APA).

Under 8 U.S.C. § 1252(a)(2)(B)(ii), courts are barred from reviewing any "decision or action" (other than asylum determinations) the "authority for which is specified ... to be discretion[ary]" under "this subchapter." *See Safadi*, 466 F.Supp.2d at 700. "[T]his subchapter" refers to Subchapter 11 of Chapter 12 of Title 8 of the U.S. Code, which is comprised of 8 U.S.C. §§ 1151-1378. Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter 11. Under section 1255(a), the "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General." Section 1255(a) provides that an alien's status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe." *Id.* Clearly, the statute and the regulations provide no time frame for the adjustment process.

With this statutory and regulatory scheme, Congress vested the Attorney General with exclusive discretion over the adjustment process. This discretion necessarily includes not only discretion whether to confer the "grace" of adjustment, but also discretion over how and when to do so. In an analogous case, *Jilin Pharm. USA, Inc. v. Chertoff*, 447 F.3d 196 (3d Cir. 2006), the Third Circuit reasoned that, because the visa revocation statute in question in relation to the Attorney General's performance provided the operative words "may" "at any time" and "deem," the statute clearly granted sole discretionary authority in the Secretary of DHS to revoke the

7

approval of any petition approved by him under Section 204. Id. at 203, 205. As such, the Third

Circuit determined that judicial review was barred under Section 1252(a)(2)(B)(ii). Id. at 205.

Here, Section 1255(a) provides the operative words "may" and "discretion"and "may" in relation

to promulgating regulations. The corresponding regulations, 8 C.F.R. § 245.1 et seq., do not set

forth any time restriction on the Attorney General.

Just as in *Jilin Pharm. USA, Inc*., it is equally clear that the Attorney General has sole

discretionary authority that is unreviewable under Section 1252(a)(2)(B)(ii).  In seeking to

compel the adjudication of an adjustment of status application under 8 U.S.C.

§ 1255(a), Plaintiffs' claims fall squarely within the purview of 8 U.S.C. § 1252(a)(2)(B)(ii) barring

judicial review.  *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003).  The USCIS's

decision to continue evaluating plaintiffs' applications, and the action it is taking in doing so, lie

within the sole discretionary authority of the Attorney General under section 1255(a).

Moreover, Congress's specific bar of subject matter jurisdiction from this Court defeats

plaintiffs' assertion of general federal question jurisdiction under 28 U.S.C. § 1331 and mandamus

jurisdiction under 28 U.S.C. § 1361. *See Safadi v. Howard*, 466 F. Supp.2d at 700; *Danilov v.

Aguirre*, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) ("[I]t is well settled that general grants of

jurisdiction may not be relied upon to expand a very specific statute that either grants or limits

jurisdiction."). Indeed, section 1252(a)(2)(B) expressly states that it applies "notwithstanding... [28

U.S.C.] § 1361," and the APA explicitly provides that it does not apply where "statutes preclude

judicial review." See 5 U.S.C. § 701(a)(2). This Court should therefore dismiss Plaintiffs'

Complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure

12(b)(1).

## II.    Mandamus May Not Issue Here Because the Plaintiff Lacks a Clear Right to an Immediate Adjudication.

The common law writ of mandamus, as codified in 28 U.S.C. § 1361, is a drastic and discretionary remedy provided in extraordinary situations to relieve a clearly deserving plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty. *See Kerr v. U.S. Dist. Ct. for N.D. Cal.*, 426 U.S. 394, 402-403 (1976). Issuance of a writ of mandamus is a drastic remedy to be invoked only in extraordinary situations. *See Chatman-Bey v. Thornburgh*, 864 F.2d 804, 806 n. 2 (D.C. Cir. 1988). It is granted only when essential to the interests of justice. *See Starnes v. McGuire*, 512 F.2d 918, 929 (D.C. Cir. 1974)(en banc); *Haneke v. Secretary of HEW*, 535 F.2d 1291, 1296 (D.C. Cir. 1976); *In Re Tripati*, 836 F.2d 1406, 1407 (D.C. Cir. 1988).

While a federal district court has authority to issue a writ of mandamus pursuant to 28 U.S.C. § 1361, its issuance is not required; rather, mandamus is issued at the discretion of the Court. *National Wildlife Federation v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980). It may only issue if three elements are met: 1) the petitioner has shown a clear and indisputable right to the relief sought; 2) the respondent has a clear nondiscretionary duty to do the particular act requested by the petitioner; and 3) no other adequate remedy is available. *See In re Diet Drugs*, 418 F.3d 372, 378-79 (3d Cir. 2005) (Alito, J.).

It is clear that the requirement of a duty to act has been interpreted to mean that the duty of the federal officer sued must be "ministerial, plainly defined and peremptory." *Jeno's Inc. v. Commissioner of Patents and Trademarks*, 498 F. Supp. 472, 476 (D. Minn. 1980). The act sought to be compelled must be "a clear nondiscretionary duty." *Pittston Coal Group v. Sebben*, 109 S. Ct. 414, 424 (1988). *Accord, Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179 (9th Cir. 1983); *Welch v. Donovan*, 551 F. Supp. 809 (D.D.C. 1982). "It is well settled that a writ of mandamus is not

available to compel discretionary acts." *Cox v. Secretary of Labor*, 739 F. Supp. 28, 30 (D.D.C. 1990)(citations omitted).

For these reasons, district courts have routinely found that mandamus relief is unavailable to compel immediate adjudication of applications for adjustment of status. *See, e.g., Li v. Chertoff et al.*, 2007 U.S. Dist. LEXIS 29766 (April 2, 2007)(motion to dismiss granted based upon lack of subject matter jurisdiction in mandamus action regarding delayed adjudication of I-485 application); *Safadi v. Howard*, 466 F. Supp. 2d 696, 698-700 (E.D. Va. 2006)(finding no jurisdiction to review discretionary pace of adjustment application adjudications); *Zheng v. Reno*, 166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001)("Matters within the INS's discretion are not reviewable under the mandamus statute"); *Zaytsev v. Gantner et al.*, 2004 U.S.Dist. LEXIS 28632 (S.D.N.Y. 2004)(denial of mandamus relief to expedite adjudication); *Grinberg v. Swacina,* _ F. Supp. _, 2007 WL 840109 at *2 (S.D. Fl. Mar. 20, 2007);*Keane v. Chertoff*, 419 F.Supp.2d 597, 599-600 *(S.D.N.Y. 2006); Saleh v. Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); Karan* v. McElroy, 2003 WL 21209769, at * 1 (S.D.N.Y.2003); *Zheng v. Reno*, 166 F. Supp. 2d 875, 880-81 (S.D.N.Y. 2001); *Sadowski v. INS*, 107 F. Supp.2d 451, 453 (S.D.N.Y. 2000); *Rahman v. McElroy*, 884 F. Supp. 782, 787 (S.D.N.Y. 1995); *Serrano v. Quarantillo,* 2007 WL 1101434 at *2-4 (D.N.J. Apr.9, 2007) (unpub. Op.)(Debevoise,J).

Here, Plaintiffs have not demonstrated that they have a clear right to an immediate adjudication, and Defendant owes no clear duty to adjudicate Plaintiffs' applications prior to the completion of the national security screenings. Thus, because there is no clear right in the Plaintiffs to the relief sought, and no plainly defined and nondiscretionary duty on the part of the Defendants to honor that right, Plaintiffs have failed to demonstrate that they are entitled to mandamus relief. *Northern States Power Co. V. U.S. Dep't of* Energy, 128 F.3d 754, 758 (D.C.Cir. 1997); *Ganem v.*

*Heckler*, 746 F.2d 844, 852 (D.C. Cir. 1984); *accord In Re Lane*, 801 F.2d 1040, 1042 (8th Cir.

1986); *Homewood Professional Care Center, Ltd. v. Heckler*, 764 F.2d 1242, 1251 (7th Cir. 1985);

*Jones v. Alexander*, 609 F.2d 778 (5th Cir. 1980); *Billiteri v. U.S. Board of Parole*, 541 F.2d 938

(2nd Cir. 1976).

### III.    There is No Jurisdiction Under the APA

The APA does not entitle a person "adversely affected or aggrieved by agency action" to

judicial review where another statute precludes judicial review or "*agency action is committed to*

*agency discretion by law." See 5 U.S.C. § 701(a)(2); Brock v. Pierce County*, 476 U.S. 253, 260 n.7

(1986).  Section 701(a)(2) precludes judicial review over Plaintiffs' claims because the adjudication

of adjustment of status applications is committed to agency discretion.  This Court should therefore

deny Plaintiffs' claims.

The APA itself does not confer jurisdiction on a district court to review the decision of an

administrative agency. *See Califano v. Sanders*, 430 U.S. 99, 107 (1977). However, a district court

may have subject matter jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has

violated the APA if the claim is not "wholly insubstantial and frivolous" or "patently without

merit." *See Bell v. Hood*, 327 U.S. 678, 682-84 (1946). Even where subject matter jurisdiction to

review an APA claim exists, however, a claim nevertheless may not be reviewed by the courts if the

relevant agency action is "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2).

"Agency action" is defined under the APA to include a "failure to act."  *See* 5 U.S.C. § 551(13).

In *Heckler v. Chaney*, 470 U.S. 821 (1985), the Supreme Court interpreted 5 U.S.C. §

701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have

no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830. As

the Court went onto explain, "if no judicially manageable standards are available for judging how

and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" Id. (emphasis added); *see also Jilin Pharm. USA*, Inc., 447 F.3d at 204-05.  In addition, at least two Supreme Court cases suggest the importance of a specified time period in allowing a court to compel agency action that is "unreasonably delayed" under section 706(1). *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004).

As explained above, the adjudication of adjustment of status applications is expressly committed to agency discretion. See 8 U.S.C. § 1255(a). Moreover, no statutory or regulatory provisions provide a "meaningful standard" against which to measure the Attorney General's process of adjudicating such an application. *See Heckler*, 470 U.S. at 830. Rather, the agency maintains complete discretion to determine not only whether to adjudicate the application, but also when to do so. *Id.*  The statute and regulations governing Plaintiffs' adjustment of status applications provide no time frame for when such  applications must be adjudicated. *See Zheng*, 166 F. Supp. 2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]"). Consequently, there is no standard against which the Court can measure whether the Agency has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication. See 5 U.S.C. § 706(1).  For these reasons, other courts have found that claims relating to alleged delays in the process of adjudicating an adjustment of status application are unreviewable under the APA.  *See Zheng*, 166 F. Supp.2d at 878-89; *Karan*, 2003 WL 21209769, at *1 (S.D.N.Y. 2003) ("[B]ecause decisions regarding the plaintiffs immigration status are committed to the discretion of the INS, this Court lacks the authority under...the APA to grant the relief the plaintiff seeks."); *Rahman v. McElroy*, 884 F. Supp. 782, 787-88 (S.D.N.Y. 1995). Moreover, as other courts have cautioned, in "matters solely within the INS's discretion[,] ...aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential

for mischievous interference with the functioning of already overburdened administrative agencies." *See Rahman*, 884 F. Supp. at 787 (internal quotes omitted); *see also Heckler*, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"). Accordingly, the Court should find that 5 U.S.C. § 701(a)(2) precludes review of the agency's adjudicative process because it is committed to agency discretion by law.

## IV.    Even Assuming Reviewability, Plaintiffs' Claim is Unripe.

The United States Constitution limits federal jurisdiction to cases and controversies. *See U.S. Const.*, art. III, § 2, ¶ 1.  As a threshold matter, this Court must bear in mind the doctrine of ripeness, which acts as a safeguard against premature judicial adjudications until an administrative decision has been formalized.  *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  This doctrine is particularly applicable to the USCIS and FBI in the context of national security screenings.

The Supreme Court has recognized that given the national security and international relations aspects of immigration, judicial deference to the Executive Branch is especially appropriate. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999).  Judicial review of immigration matters is narrowly circumscribed.  *See e.g., Reno v. Flores*, 507 U.S. 292 (1993).  Absent constitutional constraints or compelling circumstances, an agency must be permitted to fashion its own procedures to optimize its resources to most effectively discharge its multitude of administrative responsibilities. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978).

Plaintiffs have the burden to prove subject matter jurisdiction and, in the context of ripeness, must prove the fitness of the issue for judicial decision and the hardship to the parties of

withholding the Court's consideration. *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808.  The

Supreme Court previously set forth five factors in these two regards: 1) whether the decision is the

agency's definitive position; 2) whether the decision has the status of law; 3) whether the decision

has an immediate impact on the day-to-day operations of the party seeking review; 4) whether the

decision is a purely legal question that does not require further fact development; and 5) whether

immediate judicial review would speed enforcement.  *See FTC v. Standard Oil*, 449 U.S. 232,

239-40 (1980).

   Defendants have not completed Plaintiffs' security screening process, due in part to the

sheer volume of pending name check applications.  Cannon Decl. ¶¶ 13-20.  Defendants cannot

reshuffle the applicants from those who were first in line to the agencies, to those first in line to the

Courts.  These Plaintiffs have the benefit of being permitted to remain inside the United States

while the national security screening process is conducted.  While 68% of name checks that are

submitted are processed by the FBI within  48-72 hours, the Plaintiffs' applications,

sympathetically, do not fall within that category.  Cannon Dec. ¶¶ 13, 22, 23.  Thus Plaintiffs, like

thousands of other applicants in their company, must exercise patience while the national security

screening process is completed.  *See Vasili Rogatch v. Chertoff, Slip Copy,* 2007 WL 1160358

(D.R.I. April 17, 2007).  ("While the Court may be sympathetic to Plaintiff's frustration with the

length of time his application has been pending without action, this Court is without jurisdiction to

grant him any relief.  In short, he can do no more than be patient while he awaits an answer to his

application.")


## CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the Court dismiss the complaint.

Respectfully submitted,

_____Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_____s/Sherease Louis_____
SHEREASE LOUIS
Special Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TAO LUO,** *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 07-0395(RJL) |
| | ) |
| | ) |
| **ALBERTO GONZALES,** *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing Motion to Dismiss was sent by the Court's

Electronic Case Filing System, this 15th day of May , 2007 to:

Philip M. Dearborn, Esq.
Pilieromazza PLLC
888 17th St. N.W., Suite 1100
Washington, D.C. 20006

Kuck Casablanca LLC
8010 Roswell Road, Suite 300
Atlanta, A 30350

        /s Sherease Louis
SHEREASE LOUIS
Special Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.,
Washington, D.C. 20530
(202) 307-0895

16

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

TAO LUO, PENG HE & MENGMING LUO,
                                    Plaintiffs,

v.

ALBERTO R.GONZALES, et al.,

                                    Defendants.

Case Number: 1:07-CV-00395

DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

DECLARATION OF NABOONE PURIPONGS

I, Naboone Puripongs declare as follows:

1.    I am employed by the United States Citizenship and Immigration Services (USCIS") as a Supervisor with the Texas Service Center ("TSC"), in Dallas, Texas. I make this declaration based on my personal knowledge and my review of official documents and records maintained by the USCIS and information provided by other Service Centers that have similar procedures and processes. This case was transferred by the Vermont Service Center to the Texas Service Center and some of the initial processing was completed in Vermont. If called to testify, I could and would do so competently.

UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

TAO LUO,
      et al.,

     Plaintiffs,

     v.

ALBERTO GONZALES,
      et al.,

     Defendants.

Case No: 07-cv-395

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Tao Luo and Peng He, the plaintiffs in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

2

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)    Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)    Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.4 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)     Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)     Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)     In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)     In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)    The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)    The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(21)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

7

## PLAINTIFF'S NAME CHECK REQUEST

(22)    The name check request for plaintiff Tao Luo was received by the FBI from USCIS on or about September 2, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)  . The name check request for plaintiff Peng He was received by the FBI from USCIS on or about September 2, 2004, and was completed on March 3, 2005. The FBI performed its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check were forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(24)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _14th_ day of May 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

*Press Office*
**U.S. Department of Homeland Security**



U.S. Citizenship
and Immigration
Services

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit.  U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident.  However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks.  While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety.  Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process.  This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit.  This is done both to enhance national security and ensure the integrity of the immigration process.  USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently.  These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism.  These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like.  Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process.  However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

## How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—**  IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TAO LUO,** *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )    Civil Action No. 07-0395 (RJL) |
| | ) |
| **ALBERTO GONZALES,** *et al.,* | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

ORDER

UPON CONSIDERATION of the ***Defendant's Motion to Dismiss and Supporting***

***Memorandum of Points and Authorities,*** any Opposition filed thereto, and the entire record

herein, for good cause shown, it is by the Court,

ORDERED that the Defendant's motion should be and is hereby granted.

SO ORDERED.


_____                _____
DATE                                                    RICHARD JAY LEON
                                                             UNITED STATES DISTRICT COURT JUDGE